UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

J. MICHAEL GLENN, M.D.,

                              Plaintiff,

                v.

UPMC CHAUTAUQUA, and
GALO GRIJALVO, M.D.,

                              Defendants.
_____

                                                    REPORT
                                                     and
                                          RECOMMENDATION

                                          21-CV-839-LJS-LGF

APPEARANCES:        WOODS OVIATT GILMAN LLP
                    Attorneys for Plaintiff
                    DONALD W. O'BRIEN, JR., of Counsel
                    1900 Bausch & Lomb Place
                    Rochester, New York  14604

                    EAGAN & HEIMER PLLC
                    Attorneys for Defendants
                    JAMES E. EAGAN, and
                    NEAL A. JOHNSON, of Counsel
                    295 Main Street
                    Suite 1062
                    Buffalo, New York  14203

## JURISDICTION

This case was referred to the undersigned by Honorable John L. Sinatra, Jr. on

October 29, 2021, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  (Dkt. 13).  The matter is presently before the

court on Defendants' motion for summary judgment filed May 31, 2024 (Dkt. 40).

## BACKGROUND

Plaintiff J. Michael Glenn, M.D. ("Plaintiff" or "Dr. Glenn"), commenced this

medical malpractice action pursuant to New York law on July 21, 2021, against

Defendants Galo Grijalva, M.D. ("Dr. Grijalva"), and UPMC Chautauqua ("UPMC") (together, "Defendants").  Plaintiff asserts a single claim for medical malpractice alleging Dr. Grijalva was negligent in the medical treatment of Plaintiff by failing to provide Plaintiff with antibiotics for 37 hours[1] following surgical removal of Plaintiff's ruptured appendix, resulting in a sepsis infection causing short-term, long-term, and permanent injuries.  Plaintiff also seeks to hold Dr. Grijalva's employer, UPMC, vicariously liable based on respondeat superior.  Answers were filed on October 8, 2021 (Dkt. 8 (Dr. Grijalva); Dkt. 9 (UPMC)), and Amended Answers were filed on October 28, 2021 (Dkt. 11 (Dr. Grijalva); Dkt. 12 (UPMC)).  On October 29, 2021, a further Amended Answer was filed by UPMC (Dkt. 14).  Discovery is complete.

On May 31, 2024, Defendants filed the instant motion for summary judgment (Dkt. 40) ("Defendants' motion"), supported by the attached Attorney Declaration of Neal A. Johnson, Esq. (Dkt. 40-1) ("Johnson Declaration"), with exhibits A through H (Dkts. 40-2 through 40-9) ("Defendants' Exh(s). __"),[2] the Declaration of Steven D. Schwaitzberg, M.D., FACS ("Dr. Schwaitzberg")[3] (Dkt. 40-10) ("Dr. Schwaitzberg Declaration"), with exhibits 1 through 3 (Dkts. 40-11 through 40-13) ("Dr. Schwaitzberg Exh(s). __"), the Statement of Material Facts Not in Dispute Pursuant to Local Rule of Civil Procedure 56(a) (Dkt. 40-14) ("Defendants' Statement of Facts"), and the Memorandum of Law in Support of Motion for Summary Judgment by Defendants UPMC Chautauqua and Galo Grijalva, M.D. (Dkt. 40-15) ("Defendants' Memorandum").

---

[1] The record contains references to Plaintiff being without antibiotics post-op for 36 hours as well as 37 hours which the court attributes to rounding.

[2] Defendants' Exhs. D and E containing Plaintiff's medical records were separately submitted on DVDs.

[3] Dr. Schwaitzberg is Defendants' expert witness.

On June 24, 2024, Plaintiff filed the Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Dkt. 42) ("Plaintiff's Response"), attaching the Declaration of Donald W. O'Brien, Jr., Esq. (Dkt. 42-1) ("O'Brien Declaration"), with exhibits 1 through 7 (Dkts. 42-2 through 42-6) ("Plaintiff's Exh(s). __"),[4] the Declaration of Arnold L. Lentnek, M.D. ("Dr. Lentnek")[5] (Dkt. 42-7) ("Dr. Lentnek Declaration"), with exhibits A and B (Dkts. 42-8 and 42-9) ("Dr. Lentnek Exh(s). __"), and the Declaration of Michael J. [*sic*][6] Glenn, M.D. (Dkt. 42-10) ("Plaintiff's Declaration").  Plaintiff also filed on June 24, 2024, Plaintiff's Response to Defendants' Statement of Material Facts Not in Dispute and Plaintiff's Counterstatement (Dkt. 43) ("Plaintiff's Statement of Facts").  On July 2, 2024, Defendants filed the Reply Memorandum of Law in Further Support of Motion for Summary Judgment by Defendants UPMC Chautauqua and Galo Grijalva, M.D. (Dkt. 44) ("Defendants' Reply"), attaching Objections and Response to Plaintiff's Response to Defendants' Statement of Material Facts and Plaintiff's Counterstatement (Dkt. 44-1) ("Defendants' Reply Statement of Facts").  Oral argument was deemed unnecessary.

　　　　Based on the following, Defendants' motion should be DENIED in part and GRANTED in part.

---

[4] Plaintiff's Exhs. 5 and 7 contain Plaintiff's medical records and were separately submitted on DVDs.

[5] Dr. Lentnek is Plaintiff's expert witness.

[6] Unless otherwise indicated, bracketed material has been added.

## FACTS[7]

In March 2020, Plaintiff J. Michael Glenn, M.D. ("Plaintiff" or "Dr. Glenn"), a resident of DeFuniak Springs, Florida, was working at Defendant University of Pittsburgh Medical Center Chautauqua ("UPMC") in Jamestown, New York.  Although Plaintiff is a resident of Florida, Plaintiff worked at UPMC as an orthopedic hospitalist on an independent contractor basis for a rotation from mid-April to September.  Plaintiff Defendant Galo Grijalva, M.D. ("Dr. Grijalva"), was on the staff at UPMC where he was employed as a general surgeon, and on March 14, 2020, Dr. Grijalva performed a laproscopic surgical removal of Plaintiff's appendix which had ruptured.

On March 13, 2020, Dr. Glenn began to feel ill with moderate to severe abdominal pain.  On March 14, 2020, Dr. Grijalva was notified that Dr. Glenn was not feeling well and Dr. Grijalva went to the hotel room in which Dr. Glenn was staying to check on him before transporting Dr. Glenn to the emergency department ("ED") at UPMC.  Dr. Grijalva, who was the on-call general surgeon when Dr. Glenn arrived at the ED, observed Dr. Glenn "was very sick," "[i]n severe pain, weak, dehydrated."  Dr. Grijaval Dep. Tr. [8] at 20.

As of March 14, 2020, UPMC maintained a protocol for sepsis infections ("sepsis protocol").[9]  The sepsis protocol lists as objective symptoms of sepsis an elevated temperature, heart rate exceeding 90 beats per minute, respiratory rate exceeding 20 breaths per minute, and white blood cell count ("WBC") less than 4000 or greater than

---

[7] Taken from the pleadings and motion papers filed in this action.

[8] References to "Dr. Grijaval Tr." are to the page numbers of the transcript of Dr. Grijaval's December 20, 2022 deposition filed as Plaintiff's Exh. 3 (Dkt. 42-4).

[9] Plaintiff's Exh. 6 (Dkt. 42-6).

12,000, or greater than 10% bands.[10]  *Id*.  Subjective symptoms of sepsis include shivering, feeling cold, extreme pain/discomfort, clammy skin, confusion/disorientation, shortness of breath, and comments such as "I really don't feel well," or "He is not acting like himself."  *Id*.  Dr. Grijalva concedes that Plaintiff presented to the ED with at least two symptoms of sepsis including his WBC of 21,400, bands of 48, and respiration rate, thus satisfying UPMC's sepsis protocol, and Dr. Grijaval attributed the sepsis to Plaintiff's burst appendix.  Dr. Grijaval Dep. Tr. at 143-46.

Upon examination at the ED, Plaintiff underwent a CT scan of his abdomen and a laboratory blood draw.  Plaintiff's WBC and diagnostic imaging from the CT scan of Plaintiff's abdomen, which included contrast bolus administered through G-tube, showed findings consistent with perforated appendicitis including dilated (enlarged and swollen) appendix, tiny foci of infection luminal air (air outside the appendix lumen (blockage) and near the appendix indicative of perforated appendix), fluid in the right lower quadrant, reactive edema (swelling and inflammation) of the terminal ilieum and cecum (intestinal regions), and appendicoliths (calcific masses in the appendix).  Defendants' Exh. E at 58-59; Plaintiff's Exh. 5 at 40-43, 160-61.  Based on his reading of the CT scan and CT scan report, Dr. Grijaval diagnosed perforated appendix, *id*. at 38-39, and admitted Plaintiff to the hospital based on "acute ruptured appendicitis."[11]  *Id*. at 41, 42, 146.

---

[10] "The presence of immature neutrophils (bands) in the circulating blood is often used as a clinical indicator of sepsis."  *See* Is the Band Count Useful in the Diagnosis of Infection?  An Accuracy Study in Critically Ill Patients, *available at*: https://pubmed.ncbi.nlm.nih.gov/20837634/, *last visited* Mar. 26, 2025.

[11] On June 25, 2019, prior to his appendicitis, Plaintiff, based on the results of a biopsy, was diagnosed with head and neck cancer, specifically, squamous carcinoma, oropharyngeal cancer.  Dkt. 40-11 at 2-3.  To treat his cancer, Plaintiff underwent chemotherapy and radiation therapy in the palate of his mouth, *id*. at 3, which caused Plaintiff to have difficulty swallowing, and in September 2019, Plaintiff had a percutaneous endoscopic gastrostomy ("PEG tube" or "g-tube") surgically implanted for nutritional support.  *Id*. at 3; Dkt. 40-8 at 56-57; Plaintiff's Exh. 7 at 36.  The g-tube was also observed on the

At the time of his surgery, Plaintiff had a history of decreased renal function described as "mild renal insufficiency," and relevant laboratory findings included a glomerular filtration rate ("GFR") (measures how well the kidneys are filtering blood) of 57 (normal range 90-120), and borderline creatinine (waste product of muscle metabolism filtered by the kidneys) level of 1.2 (normal range .6 to 1.2). Plaintiff's Exh. 5 at 14, 36. Dr. Grijaval concedes that Plaintiff, based on his WBC of 17,100 and heart rate or beats per minute ("BPM") of 128, was septic when he was admitted. Dr. Grijaval Dep. Tr. at 147 (referencing Plaintiff's Exh. 5 at 40-41).[12] See also Defendants' Exh. E at 183 (progress notes addendum signed by Dr. Grijalva with box checked indicating sepsis was present when Plaintiff was admitted based on "tachycardia and known infection based on CT and obvious operative findings"). Dr. Grijaval was assigned to operate on Plaintiff and prior to surgery, Plaintiff was given Dilaudid for pain and was given a single dose of the antibiotic Zosyn. *Id*. at 53-54, 57; Plaintiff's Exh. 5 at 37. Certified Registered Nurse Practitioner ("CRNP") Ashely Balling ("CRNP Balling") ordered the medications. Dr. Grijaval Dep. Tr. at 57.

An addendum to Dr. Grijalva's March 14, 2020 appendectomy operative note regarding Plaintiff's surgery provides

> To whoever reads and bills these it should be a quality 22 modifier. This was a very complicated advanced perforated appendix with peritonitis and pus throughout the abdomen. After initial trocar placement at the umbilicus I could

diagnostic imaging. Plaintiff received further cancer treatment as recently as the month before his appendicitis. Dkt. 40-8 at 56-57; Plaintiff's Exh. 5 at 36.

[12] Throughout much of his hospitalization at UPMC, Plaintiff's WBC was elevated above the upper level of normal, *i.e.*, 11,000. Specifically, upon admission to UPMC on March 14, 2020, Plaintiff's WBC were 17,000, and increased over the next five days to 21,400 (March 15, 2020), 41,500 (March 16, 2020), 42,800 (March 17, 2020), 57,800 (March 18, 2020), 58,300 (March 19, 2020), before falling to 43,400 (March 20, 2020), 19,500 (March 21, 2020), 14,400 (March 22, 2020), and finally into normal range on March 23, 2020 (9,600). Plaintiff's Exh. D at 557, 561-69.

immediately see that the entire right side was walled off with visible purulent discharge and large amount of infectious adhesions throughout.  I put in the left sided lower quadrant trocar under direct vision and after trying to mobilize the right lower quadrant found a pocket of combination of pus and stool that came from an obviously perforated appendix.  The right upper quadrant trocar was then placed and with these 2 now begin to be able to mobilize some of the small bowel to move it out of the way.  I was able to catch some of this purulent effluent to send for culture.  After the appendix was fully identified and could see that near its base it was completely perforated and what appeared to be left at the base was basically stringy necrotic tissue and the Mesalt appendix.  I was able to dissect at the base of the appendix . . . . [and] at least 2-1/2-3 L of irrigation were then used to clean up the peritoneal cavity. . . .  Continued irrigation was carried out throughout the right upper quadrant left upper quadrant and the pelvis suctioning out as much purulent discharge is possible and irrigating every area. A 10 French fully perforated JP drain was then placed inside and pulled out through the right uppermost trocar. . . .  Once again please note this is a quality 22 modifier[13] due to the difficulty and advanced age perforated appendicitis with peritonitis and purulence throughout the peritoneal cavity.

Defendants' Exh. E at 121.

On March 15, 2020, following the surgery, Plaintiff felt better but was unaware what medications he was receiving and did not know whether he was receiving any antibiotics.  Plaintiff's Dep. Tr.[14] at 109-10.  In progress notes dated March 15, 2020, Dr. Grijalva reported Plaintiff's diagnosis as "peritonitis due to abscess," further described as "primarily perforated appendicitis with peritonitis [inflammation of membrane lining of abdominal wall usually infectious] and purulent discharge and abscess," although at that time all of Plaintiff's vital signs were within normal limits ("WNL"), and Plaintiff was considered to have "clinically" improved.  Plaintiff's Exh. 5 at 43.  The treatment plan provided that hyponatremia (low sodium) had improved although it was necessary to

---

[13] A quality 22 modifier refers to a medical billing code listed in the American Medical Association's Current Procedural Technology code reflecting that a surgical procedure required additional work due to the particular case's difficulty or complexity which cannot be accommodated by another code.  *See* Modifier 22 Use in Fee-for-Service Medicare, *available at* http://jamanetwork.com/jurnals/jamasurgery/fullarticle/2816728, *last visited* March 26, 2025.

[14] References to "Plaintiff's Dep. Tr." are to the pages of the transcript of Plaintiff's December 19, 2022 deposition filed as Plaintiff's Exh. 1 (Dkt. 42-1).

reduce Plaintiff's IV fluid and Plaintiff's renal function was "back to normal."  *Id*. at 44.
Dr. Grijalva further reported, "We'll need to continue IV Zosyn for now due to the
extreme amount of peritonitis, exploded perforated appendix."  *Id*.  Plaintiff's scheduled
medications, however, did not then include Zosyn or any other antibiotic; rather, Zosyn
is listed as a "one-time medication" with a single dose given intravenously on March 14
at 2:38 P.M.  *Id*.

Plaintiff, who remained hospitalized, does not have much memory of March 16,
2020 and several days following.  Plaintiff's Dep. Tr. at 113-14.  According to Plaintiff, it
was a nurse who was assigned to Plaintiff's care, one Annie Gribble ("Gribble") who
discovered on March 16, 2020, that Plaintiff was not receiving any antibiotics post-
operatively.  *Id*. at 116-17.  It was not until Gribble called Dr. Grijaval that Dr. Grijaval
ordered Plaintiff be given Zosyn which was restarted some 36 or 37 hours after the
surgery.  *Id*. at 119-20.  When Plaintiff's sepsis did not immediately respond to the
Zosyn, other antibiotics in addition to the Zosyn were prescribed, including ciproflaxin
and tobramycin, the latter two which had to be discontinued because of potential
nephrotoxicity (damaging to kidneys) and Plaintiff's laboratory results were indicative of
decreasing renal function.  Plaintiff's Dep. Tr. at 125-26; Plaintiff's Exh. 5 at 47.

Although Plaintiff experienced occipital headaches attributed to the radiation
treatment of his cancer, the headaches previously occurred only at the back of his head
but after his appendectomy, Plaintiff's headaches were much worse and involved his
entire head, Plaintiff's Dep. Tr. at 120-22, and Plaintiff noticed he was having memory
problems.  *Id*. at 38-39.  Plaintiff maintains that by March 16, 2020, he had an altered
mental state which, combined with his elevated WBC, Plaintiff attributes to his sepsis

infection.  *Id*. at 126-28.  Other symptoms Plaintiff experienced while hospitalized at UPMC include electrical shock sensations shooting down his legs.  *Id*. at 132-33.

On March 17, 2020, Plaintiff underwent a renal consult with Kiran Kandakurti, M.D. ("Dr. Kandakurti"), who noted Plaintiff's history of, *inter alia*, hypertension, and borderline chronic kidney disease, and that Plaintiff, post-appendectomy, went without IV antibiotics for 36 hours.  Plaintiff's Exh. 5 at 108-10.  Dr. Kandakurti assessed Plaintiff's condition as "worsening" and diagnosed acute kidney injury ("AKI") multifactorial (caused by multiple factors) including sepsis-acute tubular necrosis ("ATN") (acute kidney injury caused by exposure to sepsis), compounded by use of two doses of ibuprofen, and possibly by the bolus (injected) contrast dye used in the CT scan when Plaintiff presented to the emergency department on March 14, 2020.  *Id*. at 110.

In his March 18, 2020 progress notes, Dr. Grijalva refers to having consultations with a hematologist, Dr. Ebarb, and an infectious disease specialist, Dr. Brown, regarding Plaintiff's sepsis's continued failure to respond to antibiotics.  Plaintiff's Exh. 5 at 51, 74.  Despite some comments by the consultative physicians that Plaintiff's elevated WBC could be attributed to a "leukemoid reaction,"[15] *see*, *e.g.*, Plaintiff's Exh. 5 at 74, Plaintiff's working diagnosis continued to include gram negative sepsis.[16]  *Id*. at 73.

---

[15] A "leukemoid reaction" is an increase in WBC that mimics leukemia and is a response to stress or an infection.  *See* National Library of Medicine, Medline Plus, Leukemoid reaction, *available at* https://medlineplus.gov/ency/article/000575.htm, *last visited* March 26, 2025.

[16] "Gram-negative" and "gram-positive" refer to whether the associated bacteria produces a negative or positive result in the "Gram stain test."  Gram-negative bacteria are generally more difficult to treat that gram-positive because of the structure of the outer cell membrane which makes gram-negative bacteria more resistant to antibiotics – the thicker peptidoglycan cell walls of gram-positive bacteria more easily absorbs antibiotics and other antimicrobial agents rendering them easier to kill.  *See* National Library of

According to Dr. Grijlva's progress notes for March 19, 2020, Plaintiff's WBC remained elevated, and recent cultures from the fluid aspirated during surgery grew, in addition to Pseudomonas, two additional bacteria including Klebsiella, and Escherichia coli.  Plaintiff's Exh. 5 at 51.  Dr. Grijalva further noted that Plaintiff would remain on Zosyn, and that an additional antibiotic, clindamycin, was started on March 18, 2020, but then discontinued when an infectious disease physician did not believe clindamycin provided any additional benefit.  *Id*.  Plaintiff's antibiotics then included Zosyn and Tobramycin, and Dr. Grijalva remarked that he appreciated the assistance "of all the consultants as this is a difficult case."  *Id*.

Plaintiff's March 25, 2020 discharge statement states that upon presenting to the emergency department on March 14, 2020, Plaintiff had "severe increasing intractable abdominal pain" "an acute abdomen" and an elevated WBC.  Plaintiff's Exh. 5 at 26. During surgical appendectomy, Dr. Grijvalva "found a completely perforated appendix with a large amount of stool spillage and positive peritonitis throughout the abdominal cavity."  *Id*.  Although Plaintiff initially "felt much better the following day," he "then began to decompensate."  *Id*.  Dr. Grijalva explained that "[i]t seems that somehow the Zosyn fell off and was not restarted until late on Sunday."[17]

---

Medicine, Medline Plus, Gram Stain, *available at* https://medlineplus.gov/lab-test/gram-stain/, *last visited* March 26, 2025.

[17] The court notes the Sunday following Plaintiff's surgery was March 15, 2020, *see Flannery v. Cnty. of Niagara*, 2025 WL 659389, at *33 (W.D.N.Y. Jan. 31, 2025) ("The court may take judicial notice of facts established by a calendar, as the accuracy of a calendar cannot be reasonably questioned." (citing *Edwards v. Berryhill*, 2019 WL 2340953, at *4 n.10 (W.D.N.Y. June 3, 2019) (taking judicial notice of fact established by calendar), and *Nassry v. St. Luke's Roosevelt Hosp.*, 2016 WL 1274576, at *13 n.8 (S.D.N.Y. Mar. 31, 2016) (same))), while Plaintiff's medical records establish Zosyn was not restarted until early in the morning of Monday, March 16, 2020.  Plaintiff's Exh. 5 at 44, 46.

After being discharged from UPMC on March 25, 2020, Plaintiff did not immediately return to Florida because he was too weak; instead, Plaintiff and his wife stayed in a rented home close to UPMC for several weeks until Plaintiff regained his strength.  Plaintiff's Dep. Tr. at 117; Dr. Grijalva's Dep. Tr.[18] at 135.  Upon returning to Florida, Plaintiff sought treatment for his continuing memory problems with a neurologist, Dr. Aubert, at White-Wilson Medical Center in Fort Walton Beach, Florida. Plaintiff's Dep. Tr. at 38-39.  Dr. Aubert obtained An EEG and MRI of Plaintiff's brain, both of which were normal, and Dr. Aubert prescribed Adderall.  Dkt. 40-11 at 4. Plaintiff never saw his medical records from his stay at UPMC for his appendectomy until the night before Plaintiff's deposition on December 19, 2022.  Plaintiff's Dep. Tr. at 101-02.

In connection with this action, Plaintiff retained as his expert witness board certified internal medicine and infectious disease specialist Arnold L. Lentnek, M.D. ("Dr. Lentnek"), who reviewed, *inter alia*, Plaintiff's medical records and deposition transcripts, rendering an opinion on July 19, 2023.  Defendants' Exh. F (Dkt. 40-7) ("Dr. Lentnek's opinion").  According to Dr. Lentnek, when Plaintiff presented with acute appendicitis on March 14, 2020, Plaintiff was "significantly immunocompromised" by his "underlying squamous cell carcinoma of his tonsil" and the ensuing "chemo- and radiation therapy . . . ."  Dr. Lentnek's Opinion at 10.  Dr. Lentnek continued that Plaintiff's "intra-abdominal [sepsis] infection was already well-established" when Plaintiff arrived at UPMC's emergency department on March 14, 2020, and that Zosyn or a similar antibiotic should have been regularly administered until the infection

---

[18] References to "Dr. Grijalva's Dep. Tr." are to the pages of the transcript of Dr. Grijalva's December 20, 2022 deposition, filed as Plaintiff's Exh. 3 (Dkt. 42-2).

"demonstrated a clear trend towards resolution," usually 5 – 7 days in an otherwise healthy individual, but longer in an immunocompromised person like Plaintiff." *Id*. at 9-10.  The failure to administer the Zosyn as required was a deviation from accepted standards of medical care that allowed Plaintiff's sepsis infection "to flourish" until its effects were life-threatening and "was a substantial factor in causing [Plaintiff's] post-operative difficulties, both in the short term and over the long-term." *Id*. at 10-11.

Defendants retained as their expert witness Steven D. Schwaitzberg, M.D. ("Dr. Schwaitzberg"), who reviewed, *inter alia*, Plaintiff's medical records, deposition transcripts, and Dr. Lentnek's Opinion, based upon which Dr. Schwaitzberg rendered an opinion on September 6, 2023.  Defendants' Exh. I (Dkt. 40-11) ("Dr. Schwaitzberg's Opinion").  According to Dr. Schwaitzberg's Opinion, "[t]he pathology diagnosed acute appendicitis with transmural inflammation, suppurative periappendicitis [inflammation of tissue surrounding appendix] and no evidence of perforation."  Dr. Schwaitzberg's Opinion at 3.  According to Dr. Schwaitzberg, Plaintiff did not meet the criteria for sepsis following the appendectomy because except for his elevated WBC, Plaintiff's temperature, heart rate, blood pressure, and respiration rate were all normal.  *Id*. at 4.  Dr. Schwaitzberg remarked that consultations with an infectious disease specialist and hematologist at UPMC concurred that Plaintiff's "significantly elevated" WBC was a leukemoid reaction rather than indicative of an abdominal infection.  *Id*. at 3-4.  Dr. Schwaitzberg explains the use of antibiotics following abdominal surgery has been trending toward shorter durations especially where, as in the instant case, the source of sepsis has been removed and the surgeon also performs an abdominal washout and drain placement.  *Id*. at 5.  Dr. Schwaitzberg stated that "[s]ince Dr. Glenn never actually

had an intra-abdominal infection, there is no prevailing evidence that antibiotics would have made a difference to his course on day 2." *Id*. Dr. Schwaitzberg explains that because an elevated WBC attributed to an infection typically ranges between 15,000 and 25,000, Plaintiff's much higher WBC is more indicative of "a sustained inflammatory insult over the three or four days prior to being brought to the hospital by his surgeon and the process of surgery itself." *Id*. Dr. Schwaitzberg opined that when Plaintiff arrived at UPMC on March 14, 2020, he was "gravely ill" and "was clearly experiencing sepsis at the time of presentation with a clear infective source." *Id*. at 6. Dr. Schwaitzberg continued that the first step for treating sepsis was the surgical removal of the source of infection by the appendectomy, and that "all other measures are adjunctive and have minimal impact on subsequent events." *Id*. Dr. Schwaitzberg maintains that Plaintiff's leukemoid reaction would have occurred regardless of whether Plaintiff was on antibiotics immediately post-op, *id*., and that there is no evidence that Plaintiff "suffered any long-term sequelae from this episode," and instead attributes Plaintiff's complaints of long-term headaches, memory deficits, electric shock sensations, and hallucinations to Plaintiff's general health resulting from Plaintiff's cancer and treatment. *Id*. at 7.

After reviewing Dr. Schwaitzberg's Opinion, Dr. Lentnek rendered a rebuttal report, Dkt. 42-7 ("Dr. Lentnek's Rebuttal"), asserting Dr. Schwaitzberg's Opinion "sidesteps" that Plaintiff's medical records establish Plaintiff presented to UPMC's emergency department on March 14, 2020 with sepsis, as well as during his post-operative hospitalization. Dr. Lentnek's Rebuttal at 2. Dr. Lentnek also references Dr. Grijalva's deposition testimony that upon presenting to UPMC's emergency department

on March 14, 2020, Plaintiff's symptoms met UPMC's "criteria for implementing the sepsis protocols."  *Id*. (referencing Dr. Grijalva's Dep. Tr. at 145).

## DISCUSSION

Plaintiff asserts a single claim under New York law for medical malpractice against Dr. Grijalva and vicariously against UPMC alleging Dr. Grijalva deviated from acceptable standard of medical care by failing to administer antibiotics immediately following Plaintiff's appendectomy, failing to implement sepsis screening procedures, failing to detect that antibiotics had not been timely administered to Plaintiff post-surgery, discontinuing IV fluids causing dehydration and posing further risk to Plaintiff's renal functioning, and prescribing nephrotoxic antibiotics to a patient already at risk of renal failure.  Complaint ¶¶ 37-44.  Defendants' motion seeking summary judgment contends that Dr. Lentnek's Opinion is not sufficiently reliable to be admissible under Federal Rules of Evidence 702 and relevant caselaw, and absent admissible expert evidence, Plaintiff is unable to establish a *prima facie* claim for medical malpractice. Defendants' Memorandum at 2.

## 1.    Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

     "[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

When considering motions for summary judgment, "courts must refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments." *Saeli v. Chautauqua Cnty., NY*, 36 F.4th 445, 456 (2d Cir. 2022) (citing *Green v. Town of East Haven*, 952 F.3d 394, 406 (2d Cir. 2020)). Nevertheless, "to defeat summary judgment, 'there must be evidence on which the jury could *reasonably* find for the [non-moving party].'" *Saeli*, 36 F.4th at 456 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (italics in *Saeli*). Further, the court is "not required to assume the truth of testimony 'so replete with inconsistencies and improbabilities that a reasonable jury could not [base a favorable finding on it].'" *Saeli*, 36 F.4th at 457 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553–55 (2d Cir. 2005)).

Defendants move for summary judgment arguing that without admissible expert testimony, Plaintiff cannot establish a *prima facie* case of medical malpractice and Dr. Lentnek's opinion is not admissible because it is inconsistent with Dr. Lentnek's deposition testimony regarding the criteria for diagnosing sepsis and thus is not sufficiently reliable. Defendant's Memorandum at 15-18. Alternatively, Defendants argue summary judgment should be granted insofar as Plaintiff asserts he suffered long-term injury for which Plaintiff has no evidence, *id*. at 18-19, and Plaintiff offers no evidence supporting vicarious liability against UPMC based on the actions of other UPMC employees. *Id*. at 19. In opposition, Plaintiff argues Defendants have not met

16

their initial burden for summary judgment insofar as Defendants rely on Dr. Schwaitzberg's opinion which is undermined by his deposition testimony, Plaintiff's Response at 3-5, triable issues of material fact preclude summary judgment, including whether the care rendered by Defendants deviated from the accepted standard of care, *id*. at 5-7, as well as whether Defendants' negligence was a substantial factor in causing Plaintiff's injuries.  *Id*. at 7-9.  In further support of summary judgment, Defendants argue they met their burden on summary judgment by pointing to a lack of admissible evidence supporting Plaintiff's claim, Defendants' Reply at 3-5, especially because Dr. Lentnek's opinion is inadmissible, *id*., at 5-8, nor does Plaintiff have any expert opinion evidence regarding Plaintiff's claimed long-term injury.  *Id*. at 8-10.

## 2.    Medical Malpractice

"Under New York law, the 'essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury.'"  *Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 Fed.Appx. 44, 46 (2d Cir. 2018) (quoting *DiMitri v. Monsouri*, 754 N.Y.S.2d 674, 675 (2d Dep't 2003)).  "A medical malpractice defendant is *prima facie* entitled to summary judgment if it demonstrates that it 'did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries.'"  *Id*. (quoting *Ducasse v. N.Y.C. Health & Hosps. Corp.*, 49 N.Y.S.3d 109, 111 (1st Dep't 2017)).  "To survive summary judgment, a plaintiff 'must submit evidentiary facts or materials' to 'demonstrate the existence of a triable issue of fact.'"  *Id*. (quoting *Alvarez v. Prospect Hosp.*, 501 N.E.2d 572, 574 (N.Y. 1986).  Further, "'unless the alleged act of

malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'" *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987) (quoting *Keane v. Sloan-Kettering Institute for Cancer Research*, 464 N.Y.S.2d 548, 549 (2d Dep't 1983)).

### 3.    Expert Evidence

The admissibility of expert testimony is evaluated under Federal Rule of Evidence 702 ("Rule 702"), and that rule requires the district court to make several determinations prior to allowing expert testimony: whether (1) the witness is qualified to be an expert; (2) the proffered opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will assist the trier of fact. *See Nimely v. City of New York*, 414 F.3d 181, 396-397 (2d Cir. 2005). Rule 702 provides that "an expert witness, unlike a lay witness, is 'permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.'" *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 (1993) ("*Daubert*"). It is the responsibility of the trial judge to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

"Under *Daubert,* 'the district court functions as the gatekeeper for expert testimony,' whether proffered at trial or in connection with a motion for summary judgment." *Major League Baseball Properties, Inc.*, 542 F.2d at 311 (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997), and citing *Boucher v. U.S. Suzuki Motor*

*Corp.,* 73 F.3d 18, 22 (2d Cir.1996)).  In applying the "liberal admissibility standards" of Rule 702, *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), the determination of whether proposed expert testimony is sufficiently reliable and relevant is committed to the "'sound discretion of the trial court.'"  *Lee Valley Tools, Ltd. v. Industrial Blade Co.*, 288 F.R.D. 254, 265 (W.D.N.Y. 2013) (quoting *American Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120, at *3 (W.D.N.Y. 2008) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999))). Further, the inquiry of whether the expert's opinion includes sufficient indicia of reliability to carry out the "'gatekeeping' function" required by *Daubert*, 509 U.S. at 597, "is fluid and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 597), but such opinions "'must be tied to the facts of a particular case.'" *Id.* (quoting *Kumho*, 526 U.S. at 150). The purpose of the court's evaluation is to exclude expert opinion "that is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), and thereby exclude "junk science, while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos*, 303 F.3d at 267.  Provided the basis for the expert testimony at issue is "'supported by good grounds,'" *id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745-46 (3rd Cir. 1994)), "'shaky but admissible evidence'" should be subject to attack by "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Amorgianos*, 303 F.3d at 267 (quoting *Daubert,* 509 U.S. at 596).

 *Daubert*'s "'requirement that the expert testify to scientific knowledge— conclusions supported by good grounds for each step in the analysis—means that *any*

step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.'" Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994) (itlics in *In re Paoli R.R. Yard PCB Litig.*), and citing *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 155 (3d Cir. 1999) ("[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia.*").  These standards apply to the question in a medical malpractice action regarding whether a plaintiff's injuries were specifically caused by a defendant's negligence. *Amorgianos*, 303 F.3d at 268.  Furthermore, where, are here, the issue presented, *i.e.,* whether the inadvertent discontinuation of Zosyn for 37 hours after Plaintiff's appendectomy was a deviation from standard medical care that contributed to an exacerbation of Plaintiff's sepsis infection with both short- and long-term detrimental health consequences, presents such an ordinary case that does not require a detailed elaboration of the scientific methodology underlying the issue, the physician may rely on his or her education and experience.  *See Franz v. New England Disposal Technologies, Inc.*, 2016 WL 3344187, at * 4 (W.D.N.Y. June 16, 2016) (rejecting the defendant's challenge under *Daubert* to the reliability of the plaintiff's expert witness, an orthopedic surgeon, who rendered an opinion regarding the injuries to the plaintiff's musculoskeletal system that were based on readily apparent trauma (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (court has discretion to avoid "unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted")).

Although expert testimony "should be excluded where it is 'speculative or conjectural,' . . . arguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility, of the testimony.'"  *Robinson v. Suffolk County Police Dep't.*, 544 Fed.Appx. 29, 32 (2d Cir. Nov. 14, 2013) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)) (internal citations and quotation marks omitted).  Additionally, expert testimony is "not *per se* unreliable simply because it relies upon some unverified or inaccurate information provided by the expert's client." *Lee Valley Tools, Ltd.* v. 288 F.R.D. at 267 (citing cases).  An expert's opinions that are without factual basis and are based on speculation or conjecture are inappropriate material for consideration on a motion for summary judgment.  *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997) ("[A]n expert's report is not a talisman against summary judgment.")).  An expert's conclusory opinions are similarly inappropriate.  *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 142 (2d Cir.2000) (where the issue was the fairness of Liberian proceedings leading to a judgment, an expert's statement that "'Liberia's judicial system was and is structured and administered to afford party-litigants therein impartial justice'" was "purely conclusory" and hence insufficient to defeat summary judgment)).

### 4.    Analysis

The court first addresses whether Dr. Lentnek's Opinion is sufficiently reliable to be considered in analyzing Plaintiff's medical malpractice claim.  Toward that end, Defendants do not dispute that Dr. Lentnek, a board certified internal medicine and infectious disease specialist, is qualified to provide opinions regarding the nature and

extent of Plaintiff's injuries, *see* Defendants' Memorandum at 14 (assuming Dr. Lentnek's Opinion should not be excluded for lack of proper qualifications); rather, Defendants challenge Dr. Lentnek's Opinion as based on inadequate data and methodology insofar as Dr. Lentnek's Opinion does not apply his own diagnostic criteria for sepsis to the facts of this case. *Id*. at 15. According to Defendants, Dr. Lentnek does not "seem to be aware of when the patient [Plaintiff] may have experienced these diagnostic criteria or recognize that the patient did not consistently experience more than one of those diagnostic criteria at any given time," in contrast to Dr. Lentnek's testimony that a patient "must have two or three of those diagnostic criteria in order to be diagnosed with sepsis," *id*., and that not only does Dr. Lentnek recognize that Plaintiff never experienced three of the diagnostic criteria for sepsis, including fever tachycardia, and low blood pressure, but for all but two days of Plaintiff's hospitalization at UPMC, Plaintiff only exhibited one of the criteria for sepsis, *i.e.*, an elevated WBC. *Id*. at 15-16. Defendants thus maintain that even if Plaintiff met the criteria on two days, including March 17, 2020 when Plaintiff had decreased kidney functioning, and March 21, 2020, when a nurse observed Plaintiff was confused in the morning, it cannot be gainsaid that Plaintiff did not experience a prolonged period of sepsis on the other days of his hospitalization when Plaintiff did not meet additional criteria. *Id*. at 17. Defendants argue these asserted deficiencies and inconsistencies establish Dr. Lentnek's Opinion is unreliable leaving Plaintiff without the requisite expert opinion to establish *a prima facie* case of medical malpractice. *Id*. at 15-17. In opposition, Plaintiff argues that there are genuine issues of fact regarding whether Defendants' failure to continue Plaintiff on antibiotics immediately following his appendectomy caused

Plaintiff's sepsis "to flourish," leading to long-term consequences. Plaintiff's Response at 5-7. In further support of summary judgment, Defendants repeat their argument that Dr. Lentnek's Opinion and testimony are not sufficiently reliable to be admissible so as to establish a *prima facie* case of medical malpractice and requiring summary judgment in favor of Defendants. Defendants' Reply at 5-8. Defendants' arguments are without merit.

First, a careful reading of Dr. Lentnek's deposition testimony does not, as Defendants argue, fail to apply his own diagnostic criteria for sepsis to the facts of this case. In particular, at his deposition Dr. Lentnek described the criteria for clinical sepsis to include

> the appearance of a person who appears clinically ill whose temperature is either higher or lower than normal, who is often but not always tachycardic, who is having some alteration of mental status, some alteration of normal blood pressure and/or pulse and who may or may not have a focal source of discomfort or pain.

Dr. Lentnek's Dep. Tr. at 12.

In response to Defendants' question regarding how many of these criteria were required to be considered sepsis according to Dr. Lentnek's criteria, Dr. Lentnek responded, "*There is no formal definition*. Every clinician who deals with sepsis has his or her own personal but *usually* at least two or three of those." *Id*. (italics added). Dr. Lentnek thus described sepsis as "usually" requiring two symptoms for diagnosis, but clinically there is no formal definition just that clinicians usually require two or three symptoms to make the diagnosis, Dr. Lentnek's Dep. Tr. at 13-14, and thus is equivocal as to how many of the identified criteria Plaintiff needed to exhibit at any one time to be considered as having sepsis. *United States v. Christopher*, 2024 WL 5135382, at *3 (2d Cir. Dec. 17,

2024) (that the government's expert witness "did not testify with unequivocal certainty that particular words always have particular meanings goes 'to the weight, not the admissibility' of his testimony." (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). *See also United States Sec. & Exch. Comm'n v. Vali Mgmt. Partners*, 2022 WL 2155094, at *2 (2d Cir. June 15, 2022) ("Contentions that an expert's assumptions are unfounded or 'gaps or inconsistencies in the reasoning leading to the expert's opinion go to the weight of the evidence, not to its admissibility.'" (quoting *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (alterations and internal quotation marks omitted in *Vali Mgmt. Partners*).

Similarly, with regard to the "research definition sepsis," Dr. Lentnek's Dep. Tr. at 12, Dr. Lentnek testified that

> It depends upon the specific protocol and research study you are operating under and each research protocol defines sepsis as fits the needs of that protocol, so if there are 300 sepsis studies ongoing in North America right now there will be 300 different definitions, all very similar but all slightly different in their details and specifics.

Dr. Lentnek's Dep. Tr. at 12-13.

Again, Dr. Lentnek's deposition testimony cannot be construed as establishing an inflexible test for identifying or diagnosing a patient with sepsis. There thus is no merit to Defendants' argument that Dr. Lentnek's Opinion is unreliable because it does not comply with Dr. Lentnek's own asserted criteria, or any other criteria required for diagnosing sepsis. Moreover, Defendants do not contend that Dr. Lentnek's opinion is unreliable based on a lack of verifiable scientific data or other medical knowledge to support the medical indicia of sepsis or that sepsis can arise on account of the presence of a single protocol, *i.e.*, Plaintiff's elevated WBC.

In contrast, a thorough review of Dr. Lentnek's Opinion establishes it is supported by Plaintiff's medical records. In particular, Dr. Lentnek testified Plaintiff likely experienced a ruptured appendix and sepsis one to two days before arriving at UPMC's emergency department. Dr. Lentnek's Dep. Tr. at 14-15. According to Dr. Lentnek, Plaintiff presented to UPMC's emergency department on March 14, 2020 after experiencing increasingly severe right lower quadrant ("RLQ") abdominal pain for the previous two days, and "significant" elevated WBC of 17,100. Dr. Lentnek's Opinion at 2 (Dkt. 40-7 at 3). Dr. Lentnek also reported that blood cultures from blood drawn upon Plaintiff's arrival in the emergency department on March 14, 2020 tested positive for bacterium. *Id*. These findings are supported by Plaintiff's March 14, 2020 medical records for his emergency department visit for which Plaintiff is reported as presenting to UPMC's emergency department on March 14, 2020 with RLQ abdominal pain, pulse of 128, WBC of 17,100 and bands of 48%. *See* Plaintiff's Exh. 5 at 39-41 (UPMC Emergency Department Evaluation Notes dated March 14, 2020). These clinical observations, if accepted by the jurors, would establish Plaintiff met the criteria for sepsis according to UPMC's sepsis protocol requiring the presence of two objective criteria including elevated temperature, heart rate exceeding 90 beats per minute, respiratory rate exceeding 20 breaths per minute, and WBC less than 4000 or greater than 12,000, or greater than 10% bands. Plaintiff's Exh. 6.

Moreover, Dr. Grijaval agrees that Plaintiff, based on his WBC of 17,100 and heart rate or beats per minute ("BPM") of 128, was septic when he was admitted. Dr. Grijaval Dep. Tr. at 147 (referencing Plaintiff's Exh. 5 at 40-41). Dr. Grijaval specifically testified that Plaintiff "presented with what the parameters [per UPMC's sepsis protocol]

would give him a sepsis diagnosis and it was because of his burst appendix." *Id*. at

146.  Dr. Grijaval's deposition testimony is consistent with Dr. Grijaval's March 15, 2020

progress notes from the morning after Plaintiff's surgery, noting that it was Dr. Grijalva's

intention that Plaintiff continue to receive Zosyn post-surgery.  Plaintiff's Exh. 5 at 44

("We'll need to continue IV Zosyn for now due to the extreme amount of peritonitis,

exploded perforated appendix.").  Accordingly, if credited by the jury, Dr. Grijaval's

deposition testimony would establish both that Dr. Grijalva agreed Plaintiff had a sepsis

infection caused by his perforated appendix prior to performing the appendectomy on

March 14, 2020, as well as that Dr. Grijaval, based on what he observed during the

appendectomy procedure, intended that Plaintiff be continued on Zosyn immediately

following surgery.  *See Sitts*, 811 F.2d at 739 (to establish a *prima facie* case of medical

malpractice, the plaintiff must present expert testimony in support of the allegations

"unless the alleged act of malpractice falls within the competence of a lay jury to

evaluate").  Defendants' motion should thus be DENIED insofar as Defendants maintain

that Plaintiff cannot establish a *prima facie* case of medical malpractice because Dr.

Lentnek's Opinion is unreliable.

Insofar as Plaintiff maintains he suffered long-term consequences from his sepsis

infection, Defendants argue that Dr. Lentnek's Opinion cannot establish that Plaintiff

suffered from a prolonged period of sepsis following Plaintiff's surgical appendectomy

that caused Plaintiff's short- and long-term consequences.  Defendants' Memorandum

at 18-19 (referencing Dr. Lentnek's Dep. Tr. at 58:16-59:14, 61:14-15, 61:20-62:21,

63:20-25).  In opposition, Plaintiff argues Dr. Lentnek's Opinion and deposition

testimony, as well Plaintiff's deposition testimony, establish issues of fact precluding

summary judgment on the issue of whether Defendants' failure to resume Plaintiff's antibiotic therapy post-operatively was a substantial factor causing Plaintiff to experience consequences of sepsis long-term.  Plaintiff's Response at 7-8.  In further support of summary judgment, Defendants argue Plaintiff lacks any opinion regarding long-term consequences attributed to his alleged sepsis infection because Dr. Lentnek did not review any medical records subsequent to his release from UPMC, and Plaintiff's own declaration fails to demonstrate how Plaintiff's "unrelated professional experience or education may render him qualified to opin[e] as to whether or when he experience sepsis and how that may have impacted him physically or neurologically." *Id*. at 8-10.  Defendants' arguments regarding the alleged long-term consequences of Plaintiff's sepsis go to the weight of the evidence submitted rather than to the evidence's admissibility.[19]

In particular, the fact that Dr. Lentnek did not personally examine Plaintiff or review his medical records after Plaintiff was discharged from UPMC does not render Dr. Lentnek's Opinion that Defendants' treatment of Plaintiff's appendicitis deviated from accepted medical standards of care as well as that Plaintiff experienced long-term consequences of his sepsis inadmissible but, rather, goes to the weight of Dr. Lentnek's Opinion and testimony.  *See United States v. Rutigliano*, 614 Fed.Appx. 542, 545 (2d Cir. 2015) ("As the district court observed, the fact that the government's expert did not examine Rutigliano goes only to the weight the expert's testimony should be afforded, not to its admissibility." (citing *Boucher,* 73 F.3d at 21).  *See also Richardson v.*

---

[19] Defendants do not dispute Plaintiff's assertion, Plaintiff's Dep. Tr. at 38-39, 113-14, that he has was having memory problems and has little memory of March 16, 2020 and the following few days during which he remained hospitalized at UPMC.

*Correctional Medical Care, Inc.*, 2023 WL 3490904, at * 3 (2d Cir. May 17, 2023) (unreported) (holding district court erred in finding the opinion of a physician retained on behalf of the deceased plaintiff as an expert in a medical malpractice action was too speculative and conjectural as to be unreliable where the opinion was based on the plaintiff's medical diagnosis, family history of sudden death, medically documented episodes of chest pain, dizziness, and low blood pressure, all of which went to the weight of the expert's opinion, rather than to its admissibility).  Additionally, as Plaintiff argues, Plaintiff's Response at 3-5, the opinions of Plaintiff's expert, Dr. Lentnek, and Defendants' expert, Dr. Schwaitzberg, paint significantly different pictures of the treatment and care of Plaintiff's appendicitis, appendectomy, and hospitalization at UPMC that cannot be determined on summary judgment.

    In particular, Dr. Lentnek's Opinion explains that Plaintiff's medical records establish that when Plaintiff presented to UPMC's emergency department on March 14, 2020, Plaintiff exhibited symptoms consistent with a perforated appendix including a history of several days of increasingly severe RLQ abdominal pain, and significantly increased WBC, a CT scan of Plaintiff's abdomen showed fluid in the RLQ with peritoneal enhancement consistent with perforated appendicitis.  Dr. Lentnek's Opinion at 2.  Prior to surgery, Plaintiff was treated with fluids and a single 4.5 gm dose of intravenous antibiotic Zosyn at 2:45 P.M., and blood cultures from a blood draw tested positive for bacterium.  *Id*.  Dr. Grijaval performed a laparoscopic appendectomy "finding a frankly perforated appendix with free stool in the surrounding abdominal cavity."  *Id*. Surgical drains were placed and the fluids collected were cultured and showed several bacteria, yet no further antibiotics were administered until March 16, 2020 at 7:50 A.M.

when Zosyn at 4.5 gms every six hours was resumed.  *Id*.  Dr. Grijaval's first post-op surgical visit with Plaintiff was in the morning of March 15, 2020, when Dr. Grijaval wrote at 11:52 A.M. that Plaintiff was feeling much better, and that "We'll need to continue IV Zosyn for now due to the extreme amount of peritonitis, exploded perforated appendix."  *Id*. at 3-5.  Dr. Lentnek references Dr. Grijaval's response to a question posed at his deposition regarding why Dr. Grijaval signed the March 15, 2020 progress note indicating he had reviewed the list of prescribed and scheduled medications which did not include Zosyn, and Dr. Grijaval explained that his view of the progress notes on the computer screen required him to scroll down to see all such medications but he did not recall whether he did scroll down to review all the medications.  *Id*. at 5-7 (referencing Dr. Grijaval's Dep. Tr. at 87:23-91:9).  Dr. Lentnek attributed the continuing rise in Plaintiff's WBC to a high of 58,300 on March 19, 2020, accompanied by increasing severe pain requiring as many as 17 doses of pain medication on March 18, 2020, and decreasing renal function to the fact that Plaintiff, who was in an immunocompromised state because of his cancer treatment and despite the presence of significant bacteria in the abdominal cavity resulting from a perforated appendix, to the failure to regularly or continuously administer antibiotics to treat Plaintiff's intra-abdominal infection post-surgery.  *Id*. at 7-10.  According to Dr. Lentnek, "[r]ather than mitigate Dr. Glenn's sepsis, this failure allowed it to flourish."  *Id*. at 10.

At his deposition, Dr. Lentnek acknowledged Dr. Grijaval's removal of the perforated appendix eliminated the source of the sepsis infection, and agreed that Dr. Grijaval's performing an abdominal wash of the peritoneal cavity to mechanically flush out as much of the bacteria and fecal material as possible, and inserted JP drains

(silicon tubes placed in the abdominal cavity to assist with additional drainage post surgery) were proper and standard care, but explained that some bacterial inevitably would be left behind which required antibiotics to treat.  Dr. Lentnek's Dep. Tr. at 16-21.

In particular, Dr. Lentnek testified that, based on a standard dose of 4.5 gm of Zosyn intravenously every six hours, Plaintiff should have received "at least" 4 doses during the 36-37 hours post-op that he received none; and that Zosyn can be given every 4 to 6 hours or continuous infusion because Zosyn has "a very short half-life" of "approximated one hour."  Dr. Lentnek's Dep. Tr. at 22-23.  A single, pre-operative dose is appropriate only where the patient is young, in excellent health, and there are no signs the appendix has ruptured.  *Id*. at 24-25.  Dr. Lentnek further attributes the persistent rise in Plaintiff's WBC to the sepsis infection spreading into the peritoneal cavity, *id*. at 27-28, asserting the antibiotics were not as effective because they were not started until 36 hours post-op.  *Id*. at 27-29.  Dr. Lentnek further believed Plaintiff's sepsis infection and its short-term effects were resolving when Plaintiff was discharged on March 25, 2020, but the long-term consequences of the infection were continuing. *Id*. at 29-30.  Dr. Lentnek again attributed Plaintiff's long-term effects of his sepsis infection to Dr. Grijalva's deviation from standard care by not ordering antibiotic therapy starting immediately after surgery.  *Id*. at 30-31.

Dr. Lentnek further testified that based on his training and experience, post-sepsis patients usually experience long-term consequences including intestinal blockages caused by scarring and some degree of mental impairment particularly with regard to higher levels of mental functioning.  Dr. Lentnek's Dep. Tr. at 59-62.  Although Dr. Lentnek did not render an opinion within a reasonable degree of medical certainty

as to whether Plaintiff developed post-ICU syndrome (organic brain syndrome manifested by a variety of psychological reactions including fear, anxiety, depression, hallucinations, and delirium), *id*. at 63, Dr. Lentnek testified that based on Plaintiff's medical records including nursing notes describing Plaintiff as confused and lethargic, and indicators of ongoing systemic inflammation, Plaintiff developed sepsis associated encephalopathy (medical condition affecting brain function leading to changes in mental state and behavior) while a patient at UPMC.  Dr. Lentnek's Dep. Tr. at 64.

In contrast, Dr. Schwaitzberg's Opinion acknowledges that a perforated appendix is likely to result in some sepsis so thy typical protocol is to give antibiotics post-op, but maintains that there is a trend toward using fewer antibiotics for shorter duration.  Dr. Schwaitzberg's Opinion at 4-5.  According to Dr. Schwaitzberg, once the source of the infection, *i.e.*, Plaintiff's perforated appendix, was removed, the abdominal wash to flush bacteria from the peritoneal cavity, along with the placement of the JP drains was just as effective as administering antibiotics.  *Id*. at 5.  Dr. Schwaitzberg further attributes Plaintiff's continually increasing WBC not to the presence of a sepsis infection for which the WBC typically ranges from 15,000 to 25,000, but instead to "the process of a sustained inflammatory insult over the three or four days prior to being brought to the hospital by his surgeon," *id*. at 5, which was a "stressor event" that triggered a leukemoid reaction rather than an infection.  *Id*. at 6.

In addition to contrasting expert opinions, other evidence in the record, including the deposition testimony of Dr. Grijalva and Plaintiff, establish issues of fact as to whether Dr. Grijalva's failure to prescribe Zosyn following Plaintiff's appendectomy was a deviation from standard medical care that caused Plaintiff to experience short and

long-term health problems.  In particular, Dr. Grijalva testified that while performing

Plaintiff's appendectomy, it was apparent that Plaintiff's appendicitis was advanced and

unusually complicated based on fluid and pus within the peritoneal cavity, the appendix

was completely "perforated, destroyed, black" with stool and pus coming out of it and

with only stringy, necrotic tissue remaining.  Dr. Grijalva Dep. Tr. at 68-70.

Following Plaintiff's appendectomy, Dr. Grijalva assumed Plaintiff remained on Zosyn

post-op, even though Zosyn is not listed on Plaintiff's medications.  *Id*. at 125-26.  Dr.

Grijalva explained he ordered on March 18, 2020 a consultation with nephrologist Dr.

Kandukurti because Plaintiff's laboratory work showed renal insufficiency.  Dr. Grijalva

Dep. Tr. at 107-108.  Dr. Kandukurti diagnosed Plaintiff with acute renal insufficiency or

acute kidney injury ("AKI") which was multi-factorial including peritonitis due to abscess,

hypertension, gram-negative sepsis (systemic inflammatory response syndrome caused

by spread of gram-negative bacteria into the bloodstream), and hyponatremia (low

blood sodium).  *Id*. at 107-08.  Plaintiff's AKI was noted to have been compounded by

two doses of ibuprofen administered upon Plaintiff's admission.  *Id*. at 107-109.

Following Dr. Kandukurti's consultation, two antibiotics that had been prescribed,

including clindamycin and tobramycin, were discontinued because they were

considered as possibly nephrotoxic.  *Id*. at 118-19.  According to Dr. Grijalva, although

Plaintiff's AKI was noted in Plaintiff's medical chart, Dr. Brown ordered the tobramycin

which is known to be nephrotoxic, *id*. at 119-20, and Dr. Grijalva discontinued the

tobramycin as soon as he knew about it.  *Id*. at 122-23.

Plaintiff testified that although initially he felt better on March 15, 2020, the day

after the appendectomy, he had hardly any memory of the next few days other than that

he had worsening headaches although he was not sure whether the discontinuation of
the Zosyn for 37 hours, during which time he received no antibiotics, contributed to the
headaches.  Plaintiff's Dep. Tr. at 119-21.  Plaintiff explained it was his understanding
that after he was not on antibiotics for 37 hours, his infection did not immediately
respond to "a whole host of different ones" when the antibiotics were restarted leaving
him "very sick" as his WBC continued to elevate.  *Id*. at 123-24.  Based on his elevated
WBC and "altered mental status," Plaintiff believed he was septic.  *Id*. at 126.  Contrary
to Dr. Schwaitzberg's opinion on this issue, *see* Discussion, *supra*, at 31, according to
Plaintiff, no medical provider ever attributed his elevated WBC to his cancer treatments.
*Id*. at 124-25.  Plaintiff also described episodes of problems thinking, hallucinations, and
electric shock sensations in his legs that a neurologist at UPMC, Dr. Murphy, attributed
to "some kind of focal seizure [originating in the brain] activity."  *Id*. at 129-30.  Plaintiff
had at least one additional episode of the seizure activity after being discharged from
UPMC and prior to returning to Florida, *id*. at 131-32, but the visual and auditory
hallucinations continued for up to six months after.  *Id*. at 135-36.  Upon returning to
Florida and establishing treatment with Dr. Aubert, Plaintiff underwent diagnostic
neuropsychologic testing that showed Plaintiff with memory deficits exceeding what
would be anticipated based on his age.  *Id*. at 140-42.  Plaintiff attributes his memory
deficits to the 37-hour gap in antibiotics treatment post-operatively which allowed the
bacteria in his blood stream to substantially increase.  *Id*. at 144-46.  This is consistent
with Dr. Lentnek's opinion that the failure to continue Plaintiff on Zosyn immediately
following surgery cause the sepsis infection "to flourish" and Plaintiff to develop sepsis-
associated encephalopathy based on Plaintiff's confusion and lethargy.  Dr. Lentnek's

Dep. Tr. at 64-65.  Plaintiff also maintains that since his hospitalization at UPMC, he has experienced decreased coordination particularly with stairs and at one point his hands shook as though he had a tremor, although most of Plaintiff's coordination issues had resolved by the time of his deposition.  Plaintiff's Dep. Tr. at 151-54.

The divergent expert opinions, along with other evidence including, *inter alia*, the deposition testimony of Dr. Grijalva and Plaintiff, establish issues of fact that must be resolved by a jury.  Accordingly, summary judgment as Defendants request should be DENIED.

Defendants alternatively argue that UPMC cannot be held vicariously liable for the negligence of other, unnamed UPMC employees in connection with the care and treatment of Plaintiff, Defendants' Memorandum at 19.  As Defendants observe in further support of summary judgment, Defendants' Reply at 10, Plaintiff does not respond to this argument.  Accordingly, this argument has been abandoned by Plaintiff. *See Whitt v. Kaleida Health*, 298 F. Supp. 3d 558, 567–68 (W.D.N.Y. 2018) ("Where, as here, a counseled non-moving party submits 'a partial response arguing that summary judgment should be denied as to some claims while not mentioning others,' the Court may deem that the response is 'an abandonment of the unmentioned claims.'") (quoting *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014))).  Accordingly, Defendants' motion should be GRANTED insofar as Plaintiff seeks to hold UPMC vicariously liable for the negligent acts of any employees other than Dr. Grijalva.

## <u>CONCLUSION</u>

Based on the foregoing, Defendants' motion (Dkt. 40), should be DENIED in part and GRANTED in part.  The matter should be scheduled for trial.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:        March 27, 2025
              Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.


/s/ *Leslie G. Foshio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      March 27, 2025
            Buffalo, New York